ARNOLDO CASILLAS, ESQ., SBN 158519
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., Third Floor
Long Beach, CA 90807
Tel:  (562) 203-3030
Fax: (323) 297-2833
Email: acasillas@casillaslegal.com

Attorneys for Plaintiffs: Tarek Graves, Edwin Gonzalez and Jessie Carrillo

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| Tarek Graves, Edwin Gonzalez, and Jessie Carrillo,<br><br>                Plaintiffs,<br><br>vs.<br><br><br>Warren Stanley, Daniel Minor, Christopher Margaris, Melissa Hammond, Martin Geller, Stephen Wadleigh, D. Yokley and DOES 1 through 10,<br><br>                Defendants.<br>_____ | ) **Case No.**<br>)<br>) **COMPLAINT FOR DAMAGES**<br>)<br>) **1. 42 U.S.C. § 1983, FOURTH**<br>) **AMENDMENT VIOLATION**<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

///

///

///

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

COME NOW PLAINTIFFS Tarek Graves, Edwin Gonzalez and Jessie Carrillo and allege as follows:

### I.

### INTRODUCTION

1.     The California Highway Patrol ("CHP) is a law enforcement agency. Through a long-standing custom and practice which has been in place for decades, CHP employees have been dismissed early from a variety of assignments and have compensated for a full shift.  Per this custom/practice, CHP employees receive compensation or overtime pay for the entirety of the assignment despite being dismissed early.  For decades, CHP supervisors, including the present defendants, acknowledged, ratified and condoned the custom/practice of CHP employees being dismissed early from an assignment and being compensated for a full shift.  So widespread was this custom/practice, that each of the present defendants – along with other supervisors - partook in this custom/practice throughout their CHP careers.

2.     Broadly, the CHP custom/practice of receiving compensation per assignment, whether or not the full period of the assignment was worked, includes training assignments, security assignments, overtime assignments, public relations assignments, and other official assignments.  This custom/practice was, and currently is, in place throughout the seven CHP Divisions and 102 stations across the State of California.   Two categories of such assignments were and are the Construction Zone Enhanced Enforcement Program (COZEEP) and the Maintenance Zone Enhanced Enforcement Program (MAZEEP).  Under these programs, CHP officers and supervisors would assist the California Department of Transportation ("CALTRANS") in their construction and maintenance work along California freeways and highways by providing traffic control and safety services.  CHP employees would work these assignments on an overtime basis and would be paid by

CALTRANS for an eight-hour assignment whether or not the underlying CALTRANS work lasted for the full eight hours.

3.     The purpose of this lawsuit is to demonstrate how the present defendants purposefully and wrongfully undertook a deliberate course of conduct to violate the constitutional rights of the present plaintiffs by falsely accusing them of engaging in misconduct related to overtime practices and then wrongfully terminating these plaintiffs' employment.  Moreover, the purpose of this lawsuit is to bring to light the hypocrisy and malice shown by the present defendants and to impose appropriate punitive damages against them so as to make examples of them and thereby prevent similar conduct by similarly situated actors in the future.

## II.
## JURISDICTION AND VENUE

4.     This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourth and Fourteenth Amendments of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the COUNTY OF LOS ANGELES, California, and all of the Defendants reside in the County of Los Angeles.

6.     With respect to Plaintiffs' supplemental state claim, Plaintiffs request that this Court exercise supplemental jurisdiction over such claim as it arises from the same facts and circumstances which underlie the federal claims.

///
///
///
///

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

### III.

### PARTIES

7.     At all times relevant hereto Tarek Graves, Edwin Gonzalez and Jessie Carrillo (hereafter also collectively, "Plaintiffs") were employees of the CHP, each working as a patrol officer, and each were terminated on or after September 3, 2019.

8.     Defendant Warren Stanley, at all times relevant here, was an employee of the CHP.  He is and, at all relevant times here, was the Commissioner of the CHP, serving as the highest-ranking member of the CHP and he had direct supervisorial authority over the present plaintiffs.  He was the final decision-maker in the termination of the present plaintiffs.  As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present plaintiffs' civil rights which resulted from his direct actions and conduct.

9.     Defendant Daniel Minor, at all times relevant here, was an employee of the CHP.  He is and, at all relevant times here, was a Division Chief of the Southern Division of the CHP, serving as a high-ranking member of the CHP with direct supervisorial authority over the present plaintiffs.  As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

the CHP. This defendant is sued individually for the violations of the present plaintiffs' civil rights which resulted from his direct actions and conduct.

10.    Defendant Christopher Margaris, at all times relevant here, was an employee of the CHP.  He is and, at all relevant times here, was a station captain for the CHP ELA Station, serving as a high-ranking member of the CHP with direct supervisorial authority over the present plaintiffs.  As to the actions alleged herein against this defendant, he acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of his employment and agency, and at all times relevant hereto was acting under the color of law.  That is, he was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present plaintiffs' civil rights which resulted from his direct actions and conduct.

11.    Defendant Melissa Hammond, at all times relevant here, was an employee of the CHP.  She is and, at all relevant times here, was a lieutenant for the CHP, serving as a supervisor with the CHP ELA Station with direct supervisorial authority over the present plaintiffs.  As to the actions alleged herein against this defendant, she acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, this defendant, at all times alleged herein, was acting within the course and scope of her employment and agency, and at all times relevant hereto was acting under the color of law.  That is, she was acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. This defendant is sued individually for the violations of the present plaintiffs' civil rights which resulted from his direct actions and conduct.

12.    Defendants Martin Geller, Stephen Wadleigh and D. Yokley at all times relevant here, were employees of the CHP.  They are and, at all relevant times here, were officers/investigators for the CHP.  As to the actions alleged herein against these defendants, they acted with malice and/or deliberate indifference to the civil rights of each plaintiff.  Further, these defendants, at all times alleged herein, were acting

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

within the course and scope of their employment and agency, and at all times relevant hereto were acting under the color of law.  That is, they were acting pursuant to the laws, regulations, statutes, authority, customs and practices of the State of California and the CHP. These defendants are sued individually for the violations of the present plaintiffs' civil rights which resulted from his direct actions and conduct.

## IV.

## STATEMENT OF RELEVANT FACTS

### A.  General Allegations

13.     PLAINTIFFS were employed by the CHP as a highway patrol officers. Their typical duties where to ensure road safety in California, protecting state buildings, conducting criminal investigations, and assisting local law enforcement agencies and operations, enforcing the California Vehicle Code, ensuring safety and public order, and writing tickets and reports when necessary and appropriate.

14.     PLAINTIFFS' employment with the CHP was terminated on or after September 3, 2019.

15.     Per established CALTRANS programs, the present plaintiffs would participate in the provision of safety and traffic control services for ongoing road repair and general maintenance work conducted by CalTrans.  Particularly, PLAINTIFFS provided such services through the Construction Zone Enhanced Enforcement Program (COZEEP) and the Maintenance Zone Enhanced Enforcement Program (MAZEEP).   Work done under COZEEP and MAZEEP was requested by CalTrans and paid by CalTrans.  To the extent that they performed work related to these programs, each such assignment or "detail" was approved by CalTrans.   The work the present plaintiffs performed related to these programs was performed for the CalTrans Bandini yard in the city of Commerce, California, as well as other CalTrans yards in the area surrounding the ELA Station.  This work was paid as overtime. The great majority of patrol officers at the ELA Station participated in providing services

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

under these programs with the Bandini yard, and all such officers received compensation for their work as overtime pay.   The shifts were from 6.5 hours to more than 12 hours, with most shifts being 8 hours. For each such assignment, PLAINTIFFS would show up at the designated work sites and leave when instructed by a CalTrans supervisor.  CalTrans would reimburse the CHP for the COZEEP and MAZEEP overtime hours worked by CHP officers, including the present plaintiffs.

16.     Often, the work that was undertaken by CalTrans did not take up the full overtime period of the assignment.  This was acknowledged by the CalTrans and the CHP.  When PLAINTIFFS were relieved early from the assignment by CALTRANS, they were subject to recall as necessary.  The present plaintiffs would return to the station and remain there for the balance of the time remaining on the overtime assignment or remain on call and available for dispatch as necessary for further CALTRANS assignment.

17.     As provided by ELA Station Standard Operating Procedure 4.5.16[1] ("SOP") that was in place from 2012 to approximately 2019, CHP officers were to be paid for the entire overtime shift of eight hours, even if CalTrans released them early, so long as they remained at the station on call until the end of the overtime shift. Also, established and accepted custom and practice was to permit officers to leave the station so long as they remained available on-call through their cell phones for the duration of their overtime shift.  This was the practice at all of the CHP stations throughout the state.

_____

[1] Each CHP station has its own set of specific procedures which relate to, and take into account, the distinct circumstances, issues and history of that station and of the area/region that the particular station patrols.  Each SOP, such as the one at issue here, is regularly evaluated and approved by CHP command.  As with the ELA SOP that is at issue in the present matter, CHP station SOP's have the force and effect of CHP policy and CHP patrol officers can be disciplined for failing to follow their station's SOP.

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

18.     Further, the SOP at the ELA Station proscribes the specific discipline to be imposed for the violation of the overtime rules: "If an officer violates the overtime policy, he/she shall be taken off the overtime rotation indefinitely."   Termination for such violation is not indicated, much less required.

19.     The present defendants, having ratified the custom and practice and having ratified the 2012 SOP, did not once discipline any officer at the ELA Station for claiming a full COZEEP/MAZEEP overtime detail after being dismissed early despite said defendants' actual knowledge that officers at the ELA Station, including the present plaintiffs, were participating in this practice from 2010 until the end of 2017.

20.     Former Assistant CHP Commissioner, William Segal, confirmed that CHP stations throughout California run their CalTrans overtime programs the same way as the ELA Station did during the time period relevant here.

21.     Defendants Warren Stanley, Daniel Minor, Christopher Margaris, Melissa Hammond, Martin Geller, Stephen Wadleigh and D. Yokley were aware of the custom and practice of allowing officers working COZEEP/MAZEEP assignments/details to leave early from the assignments and receive pay for the full overtime period.  They, along with many of the supervisors at the ELA Station, partook in well-settled CHP custom and practice of receiving overtime pay and regular pay for time not worked, including training assignments and other assignments, in the past while working at the ELA Station or at other stations in the various CHP divisions throughout the state, or otherwise regularly benefited from partaking in assignments where they would be dismissed early and yet still receive compensation for the full shift/assignment.   As stated by a former CHP Assistant Commissioner, this practice "has gone on forever."

22.     Every COZEEP/MAZEEP detail worked by the present plaintiffs was documented by both the CHP and CalTrans through various documents.  The CHP

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

administration at the ELA station reviewed and reconciled the overtime hours that were worked for the present plaintiffs as well as the other ELA CHP officers who worked COZEEP/MAZEEP assignments between 2010 and 2018.

23.     To the extent that the present plaintiffs here would receive overtime pay for hours that we were not physically present at the CalTrans COZEEP/MAZEEP work location, such practice was consistent with and similar to other CHP programs where CHP officers are dismissed early from the assignment or shift and be compensated for a full shift.   Each of the present defendants condoned this practice, and were aware of, ratified, condoned and participated in many other similar practices where CHP officers and supervisors would be dismissed early from an assignment and receive full compensation as if they had completed the full shift.

24.     Examples of such similar CHP practices condoned, ratified and participated in by each of the present defendants includes POST Mandatory Training and Training Days.  A common example of this is the widespread custom/practice within the CHP where its officers are certified as having completed trainings despite not actually having completed the full period of the trainings.  The CHP conducts internal training courses in a variety of topics which CHP officers are required to complete.  Each training assignment is specified to be of a particular length of time or to contain particular contents so as to meet the training requirements of various statutes, regulations, contractual obligations, bargaining agreements and other mandatory obligations.  The CHP commonly, if not on a daily basis, allows its officers to report as having completed the full amount of training hours for a particular training despite not actually participated in the reported hours or trained on the required material.  Some of these trainings pertain to State-mandated certification requirements set by the Commission on Peace Officer Standards and Training ("POST").   Per the CHP custom/practice of dismissing its officers early from assignments, CHP officers report to required POST training assignments put on by

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

the CHP for a mandatory training and receive less than that amount of training.  For example, some training sessions constitute a full eight-hour shift and are reported as such.  These trainings are often only 6.5 hours long, however.  Moreover, attendees are regularly instructed to go home and "study the material" and thereby are not provided training as to the materials by CHP staff.  Officers working on 10- or 12-hour shifts benefit greatly from this practice as they are paid for their full shift despite having only attended a much shorter training shift.   Besides paying the officers for the full period of time without them having actually spent the hours at the training, the CHP also reports full compliance with the training requirements to POST so as to satisfy the POST certification requirements despite the officers not having spent the required time at the trainings.  Without this certification, CHP officers are not allowed to serve.   Through this custom and practice, as it relates to training days, the CHP falsely certifies hundreds of officers annually as having attained the various POST basic, intermediate, advanced, supervisory, management and executive certifications.  The CHP conceals this custom and practice from the Attorney General's office.

25.      Most significantly, after dismissing its officers early from POST training assignments and compensating them and the trainers as if they had completed the full shift, the CHP then falsely reports a full shift to the State Commission on Peace Officer Standards and Training so as to receive reimbursement for the training under 11 CCR, section 1005 *et seq*.  Each such individual false report to POST constitutes a violation of the California False Claims Act as each such false report constitutes the knowing presentation of a false or fraudulent claim for payment using a false record or statement material to a false or fraudulent claim.  Besides the heavy burden of the CHP reimbursing POST for such falsely obtained reimbursements, such conduct exposes each reporting/requesting person to civil liability under the Act, *section 12651, et seq*.  These false/fraudulent requests also expose the CHP to civil liability

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

1    under the CFCA's Qui Tams provisions.   This false reporting is also concealed from

2    the Attorney General's office by the CHP.

3         26.    Another example of the CHP custom/practice of dismissing officers

4    early from an assignment and compensating them fully was the practice at former

5    Commissioner Stanley's office where staff members were released after lunch on

6    holidays and receive full compensation for the full day's shift.

7         27.    Another example of the CHP custom/practice of dismissing officers

8    early from an assignment and compensating them fully is the CHP "Book and Out"

9    practice whereby any officer who writes 25 tickets (a "book") can go home without

10   completing his/her shift, but still receive pay for an entire shift.

11        28.    Another example of the CHP custom/practice of dismissing officers

12   early from an assignment and compensating them fully CHP "Two for the Car" -

13   under a DUI enforcement grant, there exists a CHP practice whereby officers in a

14   two-man car who make two DUI arrests per shift, can go home without completing

15   their shifts and get paid for the entire shift.

16        29.    Another example of the CHP custom/practice of dismissing officers

17   early from an assignment and compensating them fully is the training under CHP's

18   Drug Recognition Evaluator (DRE) program, where officers undergo a 36 hour (three

19   12-hour days) in-field certification training.  Officers undergoing this training

20   regularly are released early as long as they are "on track" with meeting the number of

21   evaluations needed in the three days.

22        30.    Another example of the CHP custom/practice of dismissing officers

23   early from an assignment and compensating them fully CHP RADAR/"LIDAR"

24   training: the CHP provides training in Radar and in its Light Detection and Ranging

25   system which requires one day of training for eight hours.  The training, however,

26   includes extended breaks during the training and the officers are released early, but

27   are directed by their trainers to claim a full eight-hour shift.

28

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

31.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Radiation Detection Training where attendees are commonly released early to "beat the traffic". Attendees are paid for time which is not spent in training.

32.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Street Racing Course where trainee officers are directed to claim a full eight-hour shift for four-hour training course.

33.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the CHP Commercial Vehicle Enforcement training where attendees are directed to leave early to "beat the traffic" but allowed to claim having attended the full course period.

34.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully are the CHP Parade and Festival Details where the CHP provides personnel for parades.  CHP officers are paid a full shift despite the events rarely lasting a full day or shift.   Examples of such assignments in the Los Angeles area include Mexican Independence Day Parade, Christmas Parade, Disabilities March, Cinco de Mayo Parade, Passion for Christ March, El Monte Health and Safety Fair, El Monte's Fourth of July Parade.  Another example of this practice is the Rose Bowl Nightside Detail where CHP officers assigned for Rose Parade and Rose Bowl safety are typically dismissed by 6:00 AM but get paid until 10:00 AM.

35.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is are CHP Child Car-seat Technician Events where the CHP pays officers attending these Car Safety Seat events and the officers receive pre-determined hours of pay despite not working the full length of the pre-determined shift.

12

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

36.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully are CHP Public Information Officer Events where CHP public information officers often are paid a pre-determined amount of time for assignments that do not go for the entire time period the officers are paid for.

37.     Another example of the CHP custom/practice of dismissing officers early from training assignments and compensating them fully is the CHP Special Response Team training.   The CHP's Special Response Team trains regularly.  Many of the training assignments last only a few hours but the attendees are paid for the full day.

38.     Another example of the CHP custom/practice of dismissing officers early from an assignment and compensating them fully is the common practice carried on by CHP Protection Services Division (PSD).  This CHP division provides protection services for special events which often include State of California dignitaries from various departments and offices.   PSD assignments include, for example, "airport runs" where motorcycle officers work a two- to three-hour assignment but are paid a full shift.

39.     The practice of dismissing CHP officers early from an assignment, including CALTRANS overtime assignments, and paying the officers for the full shift was long-standing and was ratified at the highest levels of CHP management. This is acknowledged by former CHP Assistant Commissioner William Siegl, former CHP Chief Art Acevedo, former CHP Division Chief Adam Cuevas, and former CHP Captain Paul Medeiros who all confirm that this custom and practice was long-standing and condoned state-wide and at the ELA Station.

40.     Defendant Melissa Hammond worked as a CHP officer at the ELA station in 2010 and 2011.  While at the ELA Station, she worked MAZEEP/COZEEP overtime assignments where she was paid for working full shifts despite being

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

released early.  Through this personal experience, she became aware of the practice and learned that it was well-settled, ratified by her supervisors, and that CALTRANS authorized the payment of a full shift despite the officers being released early. Defendant Hammond did not complain of the practice or otherwise bring it to the attention of her supervisors while she was assigned to the ELA station.  After the ELA Station, she went to the Baldwin Park CHP station.  While there, she learned that the same MAZEEP/COZEEP overtime was in place at that station.  She then transferred to the CHP Southern Division Headquarters.  There, although knowing of the MAZEEP/COZEEP overtime that was in place at the ELA Station, she did not report it to her supervisors or otherwise bring attention to the practice.

41.    While at the CHP Southern Division Headquarters, defendant Hammond worked with defendant Daniel Minor where they became close friends and confidants.

42.    In 2016, defendant Hammond returned to the ELA Station as a lieutenant.

43.    In 2017, defendant Hammond was responsible for enforcing an overtime reduction at the ELA station and the overtime limits were reduced to 6.5 hours and then increased to 7.5 hours.  If the officers were released early from an overtime detail, they were subject to recall.  In November of 2017, defendant Hammond unilaterally decided to cancel all weekend overtime assignments; i.e., overtime work on Friday and Saturday nights.  Although she attributed this to high DUI rates and the dangers to CHP officers on overtime shifts, defendant Hammond admitted to a co-worker/sergeant that she canceled the weekend overtime details because she believed that the weekend graveyard sergeant was not managing the weekend details properly.

44.    In March of 2018, James Horejs and the ELA Station union representative filed a grievance regarding defendant Hammond's unilateral cancellation of weekend overtime details.   Part of the grievance process included an

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

informal discussion with his supervisors.  Thereafter, and in a timely fashion, James J. Horejs had an informal discussion with his supervisors regarding his complaint regarding Lt. Melissa Hammond improperly denying services to CalTrans, improperly changing well-settled past practices with respect to overtime and failing to comply with state law and CHP policy with respect to changing a practice that had existed for more than 17 years.   In approximately 5 days, his supervisors responded that the grievance was denied.  No reason for the denial was given. No written response was provided.

45.     Thereafter, and in a timely fashion, James J. Horejs filed a written grievance/complaint where he made complaints against Lt. Melissa Hammond alleging that she was improperly denying services to CalTrans, improperly changing well-settled past practices with respect to overtime and failing to comply with state law and CHP policy with respect to changing a practice that had existed for more than 17 years.

46.     The grievance/complaint that James J. Horejs filed regarding Lt. Hammond's spells out the specific activities as follows:

a.     That Lt. Hammond improperly denied request from CalTrans to provide CHP services on Friday and Saturday overnight details citing that it was "too dangerous" given the higher than normal intoxicated drivers on weekend evenings.

b.     That Lt. Hammond improperly imposed limitations and improperly denied service requests in violation of "Past Practices" provisions which state that "past practices" may take precedence over a written policy if the practice complies with certain conditions.

c.     That Lt. Hammond improperly failed to meet and confer with the Employee Organization Representative for the California Association of

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

1

2

Highway Patrol Representative, Thomas Santiago in regard to the
changes in practices and in the limitations on overtime that she imposed.

3      47.      Upon learning of this grievance, Lt. Hammond was enraged by the

4   grievance's contents and allegations, as it was directed at her and accused her of

5   improprieties.  Moreover, the remedy sought in the grievance called for Lt.

6   Hammond to cease and desist from participation in the management of the ELA

7   Station's overtime program.   The grievance caused Lt. Hammond to become

8   enraged.  In a subsequent meeting with Mr. Horejs' Union Representative, Thomas

9   Santiago, where they discussed the grievance, Lt. Hammond became further angered

10  and enraged at the allegations and tone of the grievance. Upon learning of the

11  grievance, defendant Hammond was heard in her office irately yelling profanities.

12     48.      Thereafter, Lt. Hammond telephoned her friend and confidant, defendant

13  Daniel Minor, who was then the Chief of the Southern Division, and informed him of

14  the grievance.  The grievance had the same impact on defendant Daniel Minor.  He

15  came to the ELA Station and he was also enraged by the grievance's tone and

16  content. Defendant Minor met with defendant Hammond in her office with another

17  sergeant and defendant Minor indicated to defendant Hammond that he would

18  conduct an audit of the overtime at the ELA Station and that he would use his own

19  handcuffs to arrest both plaintiff Horejs and the CHP officers' union representative.

20  He also stated that the rest of the CHP officers at the ELA station would be

21  "collateral damage".

22     49.      After defendant Minor left Hammond's office, Hammond stated to

23  station sergeants that Assistant Chief Minor was about to undertake a retaliatory

24  action against the ELA Station officers who worked the CalTrans overtime

25  assignments.  She indicated that Assistant Chief Minor was going to "burn down the

26  forest to get two trees"; that is, that through the audit and investigation, Assistant

27  Chief Minor was going to identify, investigate and retaliate against James J. Horejs

28

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

and the other officers at the ELA Station who took CalTrans overtime assignments so as to take reprisals against James J. Horejs and the other union representative.

50.     Thereafter, between March 2018 defendant Minor repeatedly conferred in person and over the phone with defendant Christopher Margaris to discuss the overtime practices at the ELA station and to develop a plan to wrongfully and improperly terminate the employment of plaintiff James Horejs for complaining about defendant Hammond's efforts regarding overtime and to carry out a plan to terminate the employment of any other ELA CHP officer who worked a COZEEP/MAZEEP overtime detail where that officer was paid a full eight hours for the detail that was cancelled early by CALTRANS.

51.     During March and April of 2018, defendants Minor and Margaris arrived at and agreed on a plan to carry out their purging of CHP officers from the ELA station.  During their discussions, defendants Minor and Margaris shared their plan with defendant Warren Stanley who was the senior person in charge of the CHP. Minor and Margaris had to secure Stanley's consent to their wrongful plan as defendant Stanley would have to sign-off on and authorize the termination of each ELA Station officer that was targeted, including the present plaintiffs.

52.     Defendant Stanley was also aware of the well-settled practice throughout the CHP of allowing personnel to claim time for hours not worked.  He, for example, had been to many training sessions over his career where the attendees were released early from the training session and allowed to claim the full period of the training session.   Defendant Stanley also had a practice during the year-end holidays where he would allow his administrative staff to leave early from work and allow them to claim the full daily time as if they had worked all day.   Defendant Stanley agreed to participate in the plan devised by defendant Minor and Margaris and authorize the firing of the majority of the ELA Station personnel despite knowing that he would be disciplining and terminating CHP officers at the ELA station for conduct that the

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

CHP had permitted, authorized and ratified over the years.  Defendant Stanley also wanted to "change the culture" at the ELA station.  That is, Stanley wanted to remove the Hispanic/Latino influence at the ELA station's management and reign in what he perceived was a strong influence of the Hispanic/Latino officers at the ELA Station.  The ELA Station, because of its geographic location in a primarily Hispanic region of Los Angeles, had over the years been a draw to many Hispanic/Latino officers who felt a sense of pride working there and who conducted themselves in a culturally sensitive way in carrying out their duties and in their policing of the Hispanic/Latino community that they worked in.  Over the years, most of the officers at the ELA Station learned of the "ELA way" which took into account the culture of the community that they were policing.   Stanley, Minor and Margaris were insensitive to the Latino-focused community-based policing that was being informally carried out at the ELA Station.  Defendants Stanley, Minor, Margaris and Hammond spoke of "changing the culture" as a way of expressing their antipathy toward the ELA Station officers who they would be dismissing from their jobs as CHP officers.

53.     Defendants Stanley, Minor, Margaris and Hammond knew that terminating the employment of the officers at the ELA station, including the present defendants, for claiming a COZEEP/MAZEEP overtime detail when released early was improper, unconstitutional and violated the Standard Operating Procedure for the ELA station.  Terminating their employment on such grounds would was improper because the CHP; 1) did not have a clear policy against the practice, 2) the ELA officers, including the present defendants, did not have notice of such a policy, and 3) the CHP had no intention enforce any such policy.  Moreover, the CHP and management at the ELA Station had permitted this practice for approximately 17 to 20 years with literally thousands of hours of such overtime being taken by ELA station officers annually.  Likewise, the CHP, the present defendants and ELA station

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

1    management never discipline any officers for having engaged in this practice over the

2    17 to 20 year history of the practice being in place at the ELA Station.

3          54.    After they developed their wrongful plan to dismiss the vast majority of

4    the ELA Station officers, the audit of the COZEEP/MAZEEP overtime details that

5    defendant Minor had threatened was undertaken for the purpose of wrongfully

6    punishing the present plaintiffs and other ELA CHP officers.

7          55.    Defendants Stanley, Minor and Margaris agreed to limit the scope of the

8    audit to only include a short period of time prior to the grievance/complaint that

9    James J. Horejs filed.   Before doing so, they consulted with defendant Stanley as to

10   their plan, it purpose, and their desire to "change the ELA Station's culture."   They

11   all agreed that by limiting the scope of their investigation to a short period, they

12   would not implicate senior officers who had moved through the ELA Station as patrol

13   officers and worked the COZEEP/MAZEEP overtime details at the ELA Station but

14   were now sergeants, lieutenants, captains and other high-ranking officers in the CHP.

15   Lieutenant Hammond was one such officer.  Although she worked

16   COZEEP/MAZEEP overtime details while a patrol officer at the ELA Station in 2010

17   and 2011 and claimed full details where she was released early by CALTRANS as

18   the present defendants did, she would not be investigated for overtime violations

19   because the investigation would not look at overtime records further back than 2017.

20   Other CHP supervisors that were protected from the investigation's scope were

21   sergeant Keith Phillips and sergeant Kelly Moore.

22         56.    The audit and investigation was carried out under the oversight of

23   defendant Margaris.  He regularly reported to defendants Minor and Stanley.  The

24   investigations followed an agreed-upon format which defendants Stanley, Minor and

25   Margaris devised and authorized.  The subject officer would be called in for an

26   interview where both criminal investigators and administrative investigators would be

27   present.  The subject would be Mirandized. Once the subject officer asserted his or

28

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

her Fifth Amendment rights and other rights, the criminal investigators would leave. The administrative investigators would then threaten the subject officer with dismissal if he/she failed to answer the questions.  Upon threat of termination, the officer would be compelled to answer all questions.  Thereafter, the administrative investigators would share information with the criminal team in violation of the subject officer's Fifth and Fourteenth Amendment rights.

57.     After devising their plan and starting the investigation, these defendants discussed and agreed to carry out a press conference to announce the findings and for the purpose of damaging the present plaintiffs' reputation and prejudicing their civil rights.  The defendants made statements at the press conference or allowed statements on behalf of the CHP to be made, that were against CHP protocol, which only allows for a brief general statement in order to maintain the integrity of the investigation and to respect the rights of the accused.   Said defendants' false statements and exaggerations were inappropriate, damaged public trust, and damaged the reputation of the present plaintiffs.  The press conference and the statements made by these defendants were approved by each defendant to this action and were ratified expressly and impliedly by defendant Stanley.

58.     As the investigations continued, defendants Stanley, Minor and Margaris, and each of them, had the authority to audit records going back to as far as 2007, but deliberately chose not to do so.  By limiting their audit to the two previous years they would be able to capture only recent overtime activity of CHP officers, including his participation.  By thus limiting their audit, they protected other higher-ranking officers, including many of their friends in the CHP, who had also participated in and benefited from this overtime practice but who had done so more remotely in time.  In other words, by limiting the audit to only the two prior years, they would exclude from the audit many CHP officers who had risen to the rank of lieutenant and above, who had engaged in this overtime practice longer than two

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

years prior.  Before undertaking the audit, they discussed their plan and its rationale with defendant Stanley.  He ratified the limited scope of the plan and agreed that doing so would protect the supervisorial staff from discipline for having partaken in the MAZEEP/COZEEP programs as the present plaintiffs have.

59.    Had the defendants audited records older than two years, Lt. Hammond herself would have been subject to investigation and discipline similar to the present plaintiffs because she worked 12 overtime shifts in the MAZEEP/COZEEP programs in 2010 and 2011.   In her statement to investigators, for example, she admitted working only one such detail and falsely claimed to have not worked more such details because of the impropriety of taking overtime for time not worked.

60.    Defendants Stanley, Minor and Margaris kept defendant Hammond apprised of their progress in the carrying out of their plan and she kept them apprised of how their efforts were being received at the ELA Station.  Between March and October of 2018, for example, defendant Hammond had several conversations with her sergeant, Connie Guzman, where defendant Hammond explained that they would be limiting the investigation to two years to avoid ensnaring supervisors they wanted to protect.  Eventually, Hammond admitted that she was "tapped on the shoulder" (i.e., a euphemism for being selected for a coveted assignment or promotion) and that she would be transferred to Southern Division Headquarters Administration, an assignment that usually leads to a promotion to captain.  Defendant Hammond was protected and promoted for her willingness to cooperate with, and participate in, the plan that defendants Stanley, Minor and Margaris had devised.

///

///

///

///

///

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

**B. Allegations regarding search warrants**

61.    The audit in question was begun on March 22, 2018 and administrative and criminal investigations into the false allegations of fraud and abuse of overtime procedures at the ELA CHP station started shortly thereafter.   Without notice to the present plaintiffs, the CHP and defendants Stanley, Minor, Margaris and Martin Geller, Stephen Wadleigh, and D. Yokley sought search warrants of PLAINTIFFS' cell phones.   Said defendants each jointly agreed to pursue the PLAINTIFFS' electronic phone records/data.  They knew that to do so, they would have to accuse PLAINTIFFS of illegal conduct or of conduct that was sufficient to establish that the plaintiffs were involved in criminal conduct.   They were aware that the taking of overtime hours for time that the officers were not in the field was a common practice at the ELA station and at other CHP stations.  These defendants knew that making allegations in affidavits to support a search warrant against PLAINTIFFS that PLAINTIFFS were engaged in the theft of overtime hours or that PLAINTIFFS were somehow misappropriating funds was false.   Notwithstanding this knowledge, these defendants instructed Martin Geller, Stephen Wadleigh, and D. Yokley to file affidavits supporting a search warrant for each of the PLAINTIFF which would accuse each  PLAINTIFF of theft of overtime, of misappropriating overtime funds from the MAZEEP program, and of falsifying documents to carry out such crimes. Each said defendant knew that such allegations would have to be made to support such search warrant and that such statements in the affidavits would be false.

62.    The identical affidavits filed in support of the search warrants by Martin Geller, Stephen Wadleigh, and D. Yokley falsely alleged that each of the PLAINTIFFS engaged in theft and embezzlement related to the CHP/CAL TRANS MAZEEP program and that PLAINTIFFS had falsified public records related to the program.   They had not engaged in such conduct.  Their claiming of hours for time that they were not in the field was authorized by the CHP and CALTRANS.  There

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

1   was a specific written standard operating procedure at the ELA station which

2   permitted PLAINTIFFS to claim the overtime hours as the did. The accusations of

3   criminal conduct related to the taking of MAZEEP overtime which were included in

4   the affidavits were false.

5         63.     Defendants Martin Geller, Stephen Wadleigh, and D. Yokley were

6   brought into the conspiracy to fire the present defendants and other ELA CHP

7   officers by defendant Margaris, who informed Martin Geller, Stephen Wadleigh, and

8   D. Yokley of their intention to "clean house" and get rid of the "ELA culture" at the

9   ELA Station.  Defendants Martin Geller, Stephen Wadleigh, and D. Yokley agreed to

10  participate in the plan by filing false affidavits to support search warrant applications

11  as part of the investigation of the ELA Station overtime activities. The present

12  defendants had the supporting affidavits sealed in their entirety to prevent the present

13  plaintiffs from the learning of their misconduct, and notice of the search warrants was

14  withheld by the present defendants in order to conceal defendants' misconduct in

15  their efforts to obtain cell phone and other electronic data from PLAINTIFFS.

16        64.     PLAINTIFFS did not learn of the false contents of the affidavits until

17  after August 11, 2020 when the search warrants and affidavits were unsealed.

18        65.     The affidavits filed by defendant Martin Geller, Stephen Wadleigh, and

19  D. Yokley falsely indicated:

20        a.     that the present plaintiffs were wrongfully taking MAZEEP/COZEEP

21               overtime hours,

22        b.     that the present plaintiffs were engaging in criminal activity,

23        c.     that defendant Melissa Hammond was unaware of such practices

24               occurring at other CHP stations,

25        d.     that Melissa Hammond had recently found that officers at the ELA

26               station were wrongfully taking MAZEEP/COZEEP hours, and

27

28

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

1       e.     that Melissa Hammond's findings were the cause of an audit of the

2           MAZEEP/COZEEP overtime practices at the ELA CHP station.

3    66.    The affiants, including defendants Martin Geller, Stephen Wadleigh, and

4 D. Yokley, as well as defendants Stanley, Minor, Margaris and Hammond.

5    67.    A copy of the affidavit filed in the each of the search warrant

6 applications for each PLAINTIFF is attached hereto as Exhibit 1.

7    68.    Said defendants knew of and deliberately withheld material information

8 from the magistrate regarding the MAZEEP/COZEEP overtime program at the ELA

9 Station.  Had the magistrate been informed of the 2012 SOP, the long accepted

10 practices at the ELA Station regarding MAZEEP/COZEEP overtime, and the well-

11 settled acknowledgement, ratification and authorization of such conduct by and

12 practices by the ELA Station's supervisory/management staff, the magistrate would

13 not have found probable cause.

14    69.    The information that the affiants, including Martin Geller, Stephen

15 Wadleigh, and D. Yokley, knew of and deliberately withheld from their affidavits

16 included:

17       a.     the existence of the 2012 ELA SOP which specifically allowed the

18           conduct that the present plaintiffs were accused of;

19       b.     that the conduct which Plaintiffs were accused of in the affidavits was

20           acknowledged, ratified and authorized as an established custom and

21           practice by the ELA Station supervisory/management staff, including

22           sergeants, lieutenants, and captains;

23       c.     that the conduct that Plaintiffs were accused of in the affidavits had been

24           engaged in by the vast majority of the ELA Station sworn personnel

25           since at least 2000;

26       d.     that, despite the knowledge of this practice by the ELA Station

27           supervisory staff since at least 2000, no ELA officer who engaged in the

28

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

conduct which Plaintiffs were accused of in the affidavits was ever administratively disciplined in any way, barred from partaking in overtime as called for in the 2012 SOP, criminally investigated or referred out for prosecution by the Los Angeles County District Attorney's office;

e.     that supervisory/management staff which had worked at the ELA Station previously had also partaken in the MAZEEP/COZEEP overtime program at the ELA Station in the same way as the present plaintiffs were accused of;

f.     that since 2000, for every instance that the present plaintiffs were accused of wrongfully taking overtime, a CALTRANS supervisor authorized the present plaintiffs to take the full amount of overtime that they sought overtime compensation for;

g.     that CALTRANS reimbursed the CHP for all of the overtime paid to the present plaintiffs;

h.     that for every MAZEEP/COZEEP overtime detail that was worked by the present plaintiffs and by other ELA Station personnel, supervisory staff at the ELA Station undertook a detailed review and reconciliation of the supporting overtime documentation submitted to support the request for overtime, and approved every MAZEEP/COZEEP overtime request made by the present plaintiffs;

i.     that the affiant's principle witness, Melissa Hammond, also partook in the conduct which Plaintiffs were accused of in the affidavits and that she was not being criminally investigated as the present plaintiffs were.

70.     The audit of the COZEEP/MAZEEP overtime details was a sham in that the present defendants knew about the COZEEP/MAZEEP overtime practices that were in place and had authorized the practices.  As noted above, after the audit, the

present defendants undertook interrogations of a large number of officers at the ELA Station, including the present plaintiffs. The questioning was part of an administrative and criminal investigation that was conducted jointly. Information between the administrative and criminal investigators was improperly shared in violation of his rights under the Peace Officers' Bill of Rights and the United States and California Constitutions.

71. The present plaintiffs were thereafter terminated for having participated in the COZEEP/MAZEEP overtime program. Defendant Stanley alleged in Plaintiffs' respective Notice of Adverse Action that was served upon them that they were paid overtime in the COZEEP/MAZEEP program for time that they did not work and for time that they were not entitled to. Defendant Stanley knew these allegations were false.

72. Plaintiffs were unlawfully and unconstitutionally terminated in violation of their due process and Fourth Amendment rights as they complied with the SOP requirements for the COZEEP/MAZEEP overtime assignments and the established customs and practices in place at the ELA station. Moreover, their termination was undertaken in retaliation for Mr. Horejs' filing of the underlying grievance/complaint.

73. These terminations were improper because the taking of overtime as was done at the ELA Station's COZEEP/MAZEEP overtime details was a well-settled and authorized practice at the ELA Station that was in place since 2000.

74. At no time while they were working the COZEEP/MAZEEP assignments during the time that was covered in the audit were the present plaintiffs informed or given notice of a change in the 2012 SOP and in the CHP's custom and practice of allowing officers working these details to leave early from the assignments and receive pay for the full overtime period. Had the present plaintiffs been informed of a change in the custom and practice, they would have complied with the changes to the custom/practice and/or in the 2012 SOP.

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

75.     Ultimately, the present plaintiffs adhered to the SOP requirements and provisions regarding COZEEP/MAZEEP assignments and complied with the established and long-standing custom/practice regarding COZEEP/MAZEEP assignments for those dates/hours that the CHP has accused him of not having worked and having improperly taken overtime for.

## V.

## FIRST CAUSE OF ACTION

## FOURTH AMENDMENT VIOLATION

## ILLEGAL SEARCHES

## AS AGAINST ALL DEFENDANTS

76.     Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

77.     This action is brought pursuant to 42 U.S.C. §1983 and §1985 for violation of Plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

78.     Each plaintiff had a meaningful property and liberty interest in his employment with the CHP that was recognized by state and federal law as well as existing state and federal precedent.

79.     In an effort to carry out an unlawful and wrongful plan to dismiss the present plaintiffs from their employment with the CHP, the present defendants surreptitiously sought search warrants to allow them to access Plaintiffs' cell phone records and other electronic data records.

80.     Defendants Stanley, Minor, Margaris, Martin Geller, Stephen Wadleigh, and D. Yokley knew that the "illegal conduct" which was the focus of the criminal investigation that they were conducting was not illegal and was not improper. This conduct, the taking of a full MAZEEP/COZEEP overtime detail when released early from that detail by CALTRANS, was a well-settled, ratified, acknowledged and

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

permitted practice at the ELA Station and at other CHP stations in California. They also knew that the SOP in place at the ELA Station since 2012 permitted this practice. Accordingly, these defendants knew that such conduct did not constitute a crime and that there was no probable no probable cause to obtain the cell phone and electronic data records from Plaintiffs.

81.     Despite this knowledge, said defendants wrongfully sought search warrants for such records and filed, or had others file, knowingly false affidavits in support of the requests for search warrants.

82.     Moreover, the said defendants engaged in judicial deception by intentionally or recklessly withholding materials facts from the magistrate.  These defendants failed to disclose the facts listed above in paragraph 67, items "a" through "i".

83.     The withheld information, as described herein above, was material to the finding of probable cause in that it would have informed the magistrate of the true nature of the overtime practices in place at the ELA Station, the ratification and acknowledgment of such practices by the supervising officers of such practice at the ELA Station and the general acceptance of such practice by the CHP over decades.

84.     Said defendants intentionally misled the magistrate when applying for the warrant, and had the magistrate considered all of the facts, the magistrate would not have found probable cause.

85.     After wrongfully obtaining the phone and electronic data records, said defendants used the records to buttress their malicious plan to dismiss the present Plaintiffs from their employment.   After wrongfully obtaining such data and records, they cited and relied upon the wrongfully obtained records in the Notice of Adverse Action issued to each of the present Plaintiffs, used the data and records in their interrogation of each of the present plaintiffs, and eventually relied on this wrongfully

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

obtained data and records to dismiss each of the present Plaintiff from their employment with the CHP.

86.     Such conduct violated the present plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

87.     The present defendants did all of this maliciously and with the intent of causing the present great personal harm and hardship.

88.     As a further direct and proximate result of the aforementioned acts alleged herein above, the present plaintiffs were significantly and permanently injured and have suffered great financial losses and expense related to the loss of their jobs.

89.     As a further direct and proximate result of the aforementioned acts alleged herein above, the present plaintiffs have suffered the loss of earnings and wages and has suffered the permanent loss of his capacity to earn wages due to the great stain on their law enforcement employment history.

90.     As a further direct and proximate result of the aforementioned acts alleged herein above, the present plaintiffs have been unnecessarily subjected to great physical and psychological pain and suffering and will continue to suffer such great physical and psychological pain and suffering for the balance of their lives.

91.     The conduct of the individual defendants, as alleged above, was done with deliberate indifference to the constitutional violations endured by the present plaintiffs.  Said defendants knew, or should have known, that their conduct was wrongful, illegal and unconstitutional and that it would seriously injured the present plaintiffs.  As such, punitive damages should be imposed, in an amount sufficient to punish each of them and to deter future similar conduct by said defendants and others in similar positions.

## **PRAYER**

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

Wherefore, Plaintiffs demand the following relief, against all the Defendants with respect the above claim for relief:

    a.    Compensatory general and special damages in an amount in accordance with proof;

    b.    Punitive and exemplary damages as to each individual defendant in an amount sufficient to deter and to make an example of these defendants;

    c.    Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988;

    d.    Costs of suit necessarily incurred herein; and

    e.    Such further relief as the Court deems just or proper, including interest, and the value of lost benefits.

Dated: September 1, 2021        CASILLAS & ASSOCIATES

By: _/s/  Arnoldo Casillas_
ARNOLDO CASILLAS
Attorneys for Plaintiffs Tarek Graves, Edwin Gonzalez and Jessie Carrillo

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

**DEMAND FOR JURY TRIAL**

COME NOW Plaintiffs Tarek Graves, Edwin Gonzalez and Jessie Carrillo, and respectfully demand that the present matter be set for a jury trial.


Dated: September 1, 2021                          CASILLAS & ASSOCIATES

                                                  By:  */s/  Arnoldo Casillas*
                                                  ARNOLDO CASILLAS
                                                  Attorneys for Plaintiffs Tarek Graves, Edwin
                                                  Gonzalez and Jessie Carrillo

31

**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**